1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10
11

PEDRO MENDOZA,                                    No.  2:98-cv-01857-MCE-GGH

12

                    Petitioner,

13

          v.                                               ORDER AND FINDINGS AND
                                                           RECOMMENDATIONS

14

JEFFREY BEARD,

15

                    Respondent.

16
17

          Petitioner is a state prisoner represented by counsel, proceeding with an application for a

18

writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The matter was referred to a United States

19

Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

20

          Petitioner challenges a judgment of conviction entered against him[1] on February 14, 1995

21

in the San Joaquin County Superior Court on two counts of first degree murder and two counts of

22

attempted premeditated murder.  The jury also found true the special circumstance of multiple

23

murders.  Both petitioner and his brother were sentenced to life without the possibility of parole.

24

          Petitioner seeks federal habeas relief on the following grounds: (1) denial of due process

25

by instructions to jury that its task was to decide between guilt and innocence; (2) violation of due

26

process rights by jury instructions that improperly reduced prosecution's burden of proof; and (3)

27
28

---

[1]  Petitioner was tried jointly tried with his brother, Luis Mendoza (petitioner in related case no.
2:98-cv-2150-MCE-GGH).

1

1   evidence was insufficient to prove premeditation, deliberation and malice.[2]  Petitioner also

2   requests an evidentiary hearing.  Upon careful consideration of the record and the applicable law,

3   the undersigned denies petitioner's request for evidentiary hearing, and will recommend that

4   petitioner's application for habeas corpus relief be denied.

5   PROCEDURAL BACKGROUND

6          This case has a lengthy history, the most profound fact being that petitioner's former

7   counsel essentially abandoned her client *for over 14 years* after this court stayed the habeas

8   petition for exhaustion of new claims.  Petitioner, initially proceeding pro se, filed a petition for

9   writ of habeas corpus on September 23, 1998.  ECF No. 1.  However, the operative petition in this

10  matter is the amended petition filed on January 27, 2000, after former counsel Weinheimer was

11  appointed.  ECF No. 26.  On May 8, 2000, this matter was stayed pending exhaustion of new

12  claims.  ECF No. 29.  The next docket entry, over 14 years later, was a request for status filed by

13  petitioner.  ECF No. 30.  After petitioner's counsel, Gail Weinheimer, requested that petitioner be

14  appointed new counsel in response to the court's order to show cause why, *inter alia*, the case

15  should not be dismissed, the court granted the motion and on November 4, 2014, Assistant

16  Federal Defender, Carolyn Wiggin, was the attorney assigned to represent petitioner in the instant

17  action.  ECF No. 41.  On November 21, 2014, the court lifted the stay and reopened this case.

18  ECF No. 42.  In resolving respondent's motion to dismiss for failure to prosecute, the

19  undersigned on April 14, 2015, recommended denial of the motion, but also recommended that

20  the unexhausted claim be forfeited.[3]  ECF No. 46.  Those findings and recommendations were

21  adopted by the district court on June 12, 2015.  ECF No. 51.  On June 18, 2015, due to a conflict

22  of the Federal Defender, present counsel, Mark Eibert, was substituted in to represent petitioner.

23  ECF No. 53.

24  ////

25  [2]  Petitioner also filed a Request for Judicial Notice.  (ECF No. 58).  Because it was filed by

26  petitioner and not his counsel, it will not be considered.  Even if it were considered, however, it
    would be denied because it requests that the court take judicial notice of records already on file in

27  this case, and because it seeks legal pronouncements which are not appropriately raised in a
    request for judicial notice.

28  [3]  The amended petition contains only exhausted claims.

2

Having now reviewed the amended petition, answer and traverse filed by Mr. Eibert, the court issues the following findings and recommendations.

FACTUAL BACKGROUND

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> A jury convicted defendants Luis and Pedro Mendoza of first degree murder of Rudy Martinez (count I) and Ernesto Arranda (count II) (Pen. Code, § 187; further statutory references to sections of an undesignated code are to the Penal Code), and of attempted, deliberate and premeditated murder of Davis Ruiz (count III) and Steven Carrillo (count IV). (§§ 664/187, subd. (a).) The jury found true the charged multiple murder special circumstance. (§ 190.2, subd. (a) (3).) Both defendants were sentenced to state prison for life without the possibility of parole.

> Charter Way is a major thoroughfare in South Stockton. Charter Way is also the claimed territory of the "Nortenos," a street gang based primarily in Northern California. Although defendants claimed to have no gang affiliation, two of the victims, Steven Carrillo and Davis Ruiz, testified defendants were members of the rival "Surrenos," a street gang based primarily in Southern California.

> Late in the evening of February 27, 1993, [petitioner] was driving his Buick on Charter Way. A friend, Anthony Perez, was in the front passenger seat. Mendoza's brother, defendant [Luis], was in the back seat along with another friend, Rene Rodriguez. [N.1 omitted.] At the same time, admitted Norteno gang members and the victims in this case, Rudy Martinez, Davis Ruiz, Steven Carrillo, and Ernesto Arranda, were in a car driving on Charter Way. [N. 2 omitted.] The Nortenos spotted [petitioner's] car. Martinez flashed his high beams and followed [petitioner] as he pulled into a Shell station.

> In the station, Carrillo and Arranda challenged [petitioner] to fight. Luis [], believing the Nortenos were armed, urged his brother not to fight and [petitioner] declined the challenge. Rodriguez observed Arranda with a handgun and told [petitioner] to "[t]ake off." As [petitioner] drove away, Arranda fired, striking the back of the Buick.

> A high speed chase ensued but eventually [petitioner] pulled away from Martinez. [Petitioner] drove to his residence on Pock Lane and parked in the back so his car could not be seen from the street. Within three-to-four minutes, the Nortenos drove past the residence and made a U-turn. When the Nortenos drew in front of defendants' residence, Arranda fired a shot from the vehicle. The Nortenos then drove away.

3

[Petitioner] got a shotgun from the house.  In the meantime, Luis [] got in the driver's seat of a green Monte Carlo, while Rodriguez and Perez got into the back seat.  Petitioner got into the front passenger seat and the group drove back to Charter Way.

According to Rodriguez, [petitioner] was angry and upset.  According to Perez, [petitioner] stated he wanted to "get those dudes."  [Petitioner] himself later admitted he wanted to kill the Nortenos so they would not bother him or his family again.  Rodriguez and Perez were afraid and asked several times to be taken home.  Defendants ignored these requests and continued looking for Martinez's vehicle.

Perez observed Martinez's vehicle on Charter Way.  Luis [] pulled in behind Martinez, who was stopped in a left turn lane.  Perez again asked to be taken home, and again his request was ignored.  When the light changed to green, Luis [] followed Martinez's vehicle as it made a left turn onto Center Street.  With [petitioner] providing directions, Luis [] pulled alongside Martinez's vehicle.  [Petitioner] twice told Luis [] to slow down.  [Petitioner] then leaned out the front passenger window, aimed his shotgun and fired.  The blast struck Martinez in the head.  Immediately, Martinez lost control of his vehicle and it crashed into a fence. [N. 3.]

[N. 3]  The shotgun blast had "blown off" the side of Martinez's face.

Luis [] put his car in reverse and, with the tires squealing, returned to the site of the crash.  Carrillo and Ruiz, who were in the back seat of Martinez's vehicle, tried to get out of the vehicle but were unable to do so.  They tried to hide in the back seat.

[Petitioner and Luis] waited inside their car for a "little while."  Then, at [Luis's] urging, [petitioner] got out of the car.  The two Mendozas walked up to the crashed vehicle.  [Petitioner] placed his arm through the driver's side window and fired the shotgun twice at point blank range at Arranda, who was sitting in the front passenger seat.  [Petitioner] then shot twice into the back seat where Carrillo and Ruiz were hiding.  The two Mendozas returned to the Monte Carlo and Luis [] drove away.

They drove to the house of Rodriguez's brother, Edward Rodriguez.  Once inside, [Petitioner] handed the shotgun to Edward Rodriguez and asked him to keep it.  [Petitioner] stated he knew he had killed the driver (Martinez) because the driver's face had been "[p]eeled off."  Perez recalled [petitioner] saying he thought he killed everyone in the vehicle.  Luis [] said he thought one person in the back seat might still be alive.  Perez was the only one with a valid driver's license.  To minimize the chances of detection in the event the vehicle was stopped, Perez drove everyone home in Edward Rodriguez's vehicle.

In the meantime, Carrillo and Ruiz managed to get out of Martinez's vehicle by crawling out the driver's side window.  Ruiz

4

had been shot in the left shoulder and back. Carrillo had been struck by shotgun pellets and was bleeding.

When police arrived at the site of the crash, Martinez was dead. Arranda was taken to a hospital where he died from his injuries.

Three expended shotgun shells were found inside Martinez's vehicle, and another shell was discovered under the rear left fender of the vehicle. An autopsy of Martinez disclosed he had suffered a fatal shotgun wound to his forehead near the left eye, causing extensive brain injury. The shot cup from the expended shell was found in the anterior brain. A criminalist testified that based upon the pellet spread and blood splatter evidence, Martinez was shot at a downward angle from a position slightly behind and at a distance probably less than six feet.

Arranda suffered numerous wounds to the abdomen and contiguous areas. The cause of death was a shotgun wound to his trunk. The wounds were so close in contact the shot cups from the expended shells were discovered intact inside Arranda's body. The criminalist concluded Arranda was shot from a distance of less than two feet.

The earlier, precipitating incident at the Shell station was not the first confrontation between [petitioner and Luis] and the Nortenos. Some 18 months earlier, in August 1991, [petitioner] and Edward Rodriguez were cruising on Charter Way armed with a loaded .380 caliber semi-automatic handgun. As they passed a Taco Bell restaurant, Arranda yelled at them, "fucking scraps." [N. 4] They returned to the Taco Bell, ostensibly to deny any gang affiliation. They pulled up next to the Taco Bell where Arranda, Carrillo, and another Norteno member, Elias Gonzalez, stood. Gonzalez and Carrillo, each carrying a large bottle of beer, approached their vehicle. Edward Rodriguez told the Nortenos that he and [petitioner] were not gang members. Gonzalez saw the handgun resting on [petitioner's] lap and asked about the weapon. Edward Rodriguez replied it was for protection. When [petitioner] reached for the gun, Gonzalez broke a beer bottle over his face, cutting and breaking his nose and causing it to bleed profusely. A second beer bottle was thrown into the vehicle, striking Edward Rodriguez on the head.

[N. 4] The term "scrap" is a derogatory term for a Surreno street gang member. A "fucking scrap" is worse even than a "scrap."

[Petitioner] fired the handgun and the Nortenos responded in kind. Edward Rodriguez drove away. Both Gonzalez and Carrillo were injured in the shoot-out (the "Taco Bell" incident).

The following day, Edward Rodriguez's house was the target of a drive-by shooting. He returned the gunfire. He believed Arranda had been in the vehicle during the drive-by and informed [petitioner] of the incident.

5

A few weeks after the Taco Bell incident, [petitioner] and the Rodriguez brothers, Edward and Rene, were again driving on Charter Way. As they pulled into an AM-PM gas station, a vehicle pulled alongside. The occupants of the vehicle wore red (the Norteno color) and stared hard at [petitioner] and the Rodriguez brothers. As the vehicle drove away, shots were fired from that vehicle at [petitioner] and the Rodriguezes. [Petitioner] returned the gunfire, but apparently did not shoot fast enough. Edward Rodriguez grabbed the gun out of [petitioner]'s hand and fired at the other vehicle. Neither [petitioner] nor the Rodriguezes reported this incident (the "AM-PM" incident) to the police.

Luis [] did not testify. [Petitioner] testified and denied he had ever been a member of a gang. He also claimed he had been harassed, threatened and shot at over a two-year period preceding the Shell station incident.

With regard to the train of events which began at the Shell station, [petitioner] claimed he pulled into the station in response to Perez's suggestion to see what the Nortenos wanted. After declining the Norteno's invitation to fight, [petitioner] drove away when Arranda was observed with a handgun. The rear of [petitioner]'s car was struck by a bullet as he drove away from the station.

A high speed chase ensued, but [petitioner] believed he had lost the Nortenos. [Petitioner] returned to his Pock Street residence and parked his car behind the house so it would not be seen from the street.

Suddenly, the Nortenos passed by, made a U-turn, and fired a shot from the car when it again passed by [petitioner's] home. [Petitioner] worried his family was in danger because the Nortenos now knew where he lived. [Petitioner] went to his room, got the shotgun, and loaded it.

[Petitioner] testified the group took the Monte Carlo so they would not be recognized by the Nortenos. He also recalled that Perez and Rodriguez asked to be taken home. [Petitioner] denied that when he and his group left in the Monte Carlo, there was any plan much less any discussion regarding finding the Nortenos and shooting them. Once on Charter Way they found themselves by chance behind the Nortenos's vehicle and followed it.

Luis [] pulled alongside the Nortenos' vehicle. [Petitioner] thought he had been spotted by the front seat passenger, Arranda, and that Arranda was reaching for a gun. [Petitioner] fired at Martinez's vehicle. The blast struck Martinez and his car crashed into a fence.

[Petitioner] approached the crashed vehicle on foot. He had no plan to shoot at the victims again. In fact, he had no explanation as to why he approached the Norteno's crashed vehicle. However, once he was at Martinez's car, he saw Arranda reaching for a gun and shot him. He reacted to movement in the back seat and fired in

that direction.  He fired again into the front and back seats.  He heard his companions calling to him and returned to the Monte Carlo.  The group then drove to Edward Rodriguez's house, where [petitioner] dropped off the shotgun.

[Petitioner] denied he was proud that he had shot the victims.  He claimed the shootings were necessary.  He feared the Nortenos would harm his family because they had harassed him previously and earlier that night had shot at him at the Shell station and again at his home.

[Petitioner] testified he did not call the police after the shot was fired at his home because he believed it would make matters worse.  Also, he did not have the license plate number of Martinez's vehicle.

[Petitioner] testified that he was lying when he told the police he intended to kill the Nortenos following the Shell station incident.

With regard to the Taco Bell incident, [petitioner] testified he and Edward Rodriguez approached the Nortenos only to inform them they were not gang members.  When he was struck by the beer bottle, the handgun was out of sight inside the glove compartment.  He fired the gun only in response to being fired upon by the Nortenos.

Regarding the AM-PM incident, [petitioner] denied firing any shots at the Nortenos.  He testified Edward Rodriguez fired the handgun, but only after having been first fired upon by the Nortenos.

Finally, [petitioner] testified to another confrontation which occurred even before the Taco Bell incident.  He claimed that he, Luis [], the Rodriguez brothers and Perez were the victims of a drive-by shooting on Pacific Avenue (the "Pacific Avenue" incident).  He claimed the shooters were the same Nortenos involved in the Taco Bell, AM-PM, etc., incidents.

ECF No. 57-9 at 1-10.

Petitioner's appeal was denied by the Third District Court of Appeal on April 24, 1997.

ECF No. 57-9.  Petitioner's May 27, 1997 petition for review was denied by the California

Supreme Court on August 13, 1997.  ECF No. 57-11.

DISCUSSION

I. AEDPA STANDARDS

The statutory limitations of federal courts' power to issue habeas corpus relief for persons

in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

7

Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), clearly established federal law consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir.2013) (citing Greene v. Fisher, ⸺ U.S. ⸺–, ⸺, 132 S.Ct. 38, 44 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir.2011) (citing Williams v. Taylor, 529 U.S. 362, 405–06, 120 S.Ct. 1495 (2000)).  Circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, ⸺ U.S. ⸺, ⸺, 133 S.Ct. 1446, 1450 (2013) (citing Parker v. Matthews, ⸺ U.S. ⸺, ⸺, 132 S.Ct. 2148, 2155 (2012)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct.  Id.

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640, 123 S.Ct. 1848 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[4]  Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003); Williams, 529 U.S. at 413;

---

[4]  The undersigned also finds that the same deference is paid to the factual determinations of state courts.  Under § 2254(d)(2), a state court decision based on a factual determination is not to be

8

1    Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir.2004).  In this regard, a federal habeas court "may

2    not issue the writ simply because that court concludes in its independent judgment that the

3    relevant state-court decision applied clearly established federal law erroneously or incorrectly.

4    Rather, that application must also be unreasonable." Williams, 529 U.S. at 412.  See also Schriro

5    v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933 (2007); Lockyer, 538 U.S. at 75 (it is "not

6    enough that a federal habeas court, in its independent review of the legal question, is left with a

7    'firm conviction' that the state court was 'erroneous.' ").  "A state court's determination that a

8    claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on

9    the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101, 131 S.Ct.

10    770 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004)).[5]

11    Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

12    must show that the state court's ruling on the claim being presented in federal court was so

13    lacking in justification that there was an error well understood and comprehended in existing law

14    beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103.

15        The court looks to the last reasoned state court decision as the basis for the state court

16    judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.2004).  If

17    the last reasoned state court decision adopts or substantially incorporates the reasoning from a

18    previous state court decision, this court may consider both decisions to ascertain the reasoning of

19    the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir.2007) (en banc).

20    "[Section] 2254(d) does not require a state court to give reasons before its decision can be

21    deemed to have been 'adjudicated on the merits.'" Harrington, 562 U.S. at 100.  Rather, "[w]hen

22  
23    overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,
384 F.3d 628, 638 (9th Cir.2004)).  It makes no sense to interpret "unreasonable" in § 2254(d)(2)
24    in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error
must be so apparent that "fairminded jurists" examining the same record could not abide by the
25    state court factual determination.  A petitioner must show clearly and convincingly that the
factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct. 969, 974
26    (2006).
27    [5] "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an
*incorrect* application of federal law.'" Harrington, 562 U.S. at 101, citing Williams v. Taylor,
28    529 U.S. 362, 410, 120 S.Ct. 1495 (2000).

1    a federal claim has been presented to a state court and the state court has denied relief, it may be

2    presumed that the state court adjudicated the claim on the merits in the absence of any indication

3    or state-law procedural principles to the contrary." Id. at 784-85.  This presumption may be

4    overcome by a showing "there is reason to think some other explanation for the state court's

5    decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S.Ct.

6    2590 (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims

7    but does not expressly address a federal claim, a federal habeas court must presume, subject to

8    rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, —— U.S. ——

9    –, ——, 133 S.Ct. 1088, 1091 (2013).  When it is clear, however, that a state court has not

10   reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d)

11   does not apply and a federal habeas court must review the claim de novo.  Stanley, 633 F.3d at

12   860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir.2006); Nulph v. Cook, 333 F.3d 1052,

13   1056 (9th Cir.2003).

14        A summary denial, therefore, is presumed to be a denial on the merits of the petitioner's

15   claims.  Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir.2012).  While the federal court cannot

16   analyze just what the state court did when it issued a summary denial, the federal court must

17   review the state court record to determine whether there was any "reasonable basis for the state

18   court to deny relief."  Harrington, 562 U.S. at 98.  This court "must determine what arguments or

19   theories ... could have supported, the state court's decision; and then it must ask whether it is

20   possible fairminded jurists could disagree that those arguments or theories are inconsistent with

21   the holding in a prior decision of [the Supreme] Court."  Id. at 786.  "Evaluating whether a rule

22   application was unreasonable requires considering the rule's specificity.  The more general the

23   rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'"  Id.

24   Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of

25   federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme

26   Court has cautioned that "even a strong case for relief does not mean the state court's contrary

27   conclusion was unreasonable."  Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166

28   (2003).

1    II.   JURY INSTRUCTION CLAIMS

2         A.   APPLICABLE LEGAL STANDARDS

3         In general, a challenge to jury instructions does not state a federal constitutional claim.

4    See Waddington v. Sarausad, 555 U.S. 179, 192 n. 5, 129 S. Ct. 823 (2009) ("we have repeatedly

5    held that 'it is not the province of a federal habeas court to reexamine state-court determinations

6    on state-law questions,'" quoting Estelle v. McGuire, 502 U.S. 62, 67–68, 112 S. Ct. 475 (1991));

7    Engle v. Isaac, 456 U.S. 107, 119, 102 S.Ct. 1558 (1982)); Gutierrez v. Griggs, 695 F.2d 1195,

8    1197 (9th Cir.1983).  In order to warrant federal habeas relief, a challenged jury instruction

9    "cannot be merely 'undesirable, erroneous, or even "universally condemned," 'but must violate

10   some due process right guaranteed by the fourteenth amendment."  Cupp v. Naughten, 414 U.S.

11   141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).  To prevail on such a claim petitioner must

12   demonstrate "that an erroneous instruction 'so infected the entire trial that the resulting conviction

13   violates due process.'"  Prantil v. State of Cal., 843 F.2d 314, 317 (9th Cir.1988) (quoting Darnell

14   v. Swinney, 823 F.2d 299, 301 (9th Cir.1987)).  The Due Process Clause "safeguards not the

15   meticulous observance of state procedural prescriptions, but 'the fundamental elements of

16   fairness in a criminal trial.'"  Rivera v. Illinois, 556 U.S. 148, 158, 129 S. Ct. 1446 (2009)

17   (quoting Spencer v. Texas, 385 U.S. 554, 563-64, 87 S. Ct. 648 (1967)).  The Supreme Court has

18   defined 'very narrowly' the category of infractions that violate fundamental unfairness.  Dowling

19   v. United States, 493 U.S. 342, 352, 110 S. Ct. 668 (1990).  In making its determination, this

20   court must evaluate the challenged jury instructions "'in the context of the overall charge to the

21   jury as a component of the entire trial process.'"  Prantil, 843 F.2d at 317 (quoting Bashor v.

22   Risley, 730 F.2d 1228, 1239 (9th Cir.1984)).

23        In order to establish a due process violation, petitioner must show both ambiguity in the

24   instructions and a "reasonable likelihood" that the jury applied the instruction in a way that

25   violates the Constitution, such as relieving the state of its burden of proving every element

26   beyond a reasonable doubt.  Waddington, 555 U.S. at 190, 129 S. Ct. at 831.  In state criminal

27   trials, the Due Process Clause of the Fourteenth Amendment "protects the accused against

28   conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

11

1   crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068 (1970).  If the

2   jury is not properly instructed concerning the presumption of innocence until proven guilty

3   beyond a reasonable doubt, a denial of due process results.  See Middleton v. McNeil, 541 U.S.

4   433, 437, 124 S.Ct. 1830 (2004) (per curiam).  An instruction which reduces the government's

5   burden of proof "is plainly inconsistent with the constitutionally rooted presumption of

6   innocence." Cool v. United States, 409 U.S. 100, 104, 93 S.Ct. 354 (1972) (per curiam)).

7          "[T]he Constitution does not require that any particular form of words be used in advising

8   the jury of the government's burden of proof.  Rather, 'taken as a whole, the instructions [must]

9   correctly conve[y] the concept of reasonable doubt to the jury.'"  Victor v. Nebraska, 511 U.S. 1,

10  5, 114 S.Ct. 1239 (1994) (quoting Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127

11  (1954) (internal citation omitted)).  "It is well established that the instruction 'may not be judged

12  in artificial isolation,' but must be considered in the context of the instructions as a whole and the

13  trial record."  Estelle, 502 U.S. at 72, quoting Cupp v. Naughten, 414 U.S. at 147.  In evaluating

14  the constitutionality of a jury charge such as this one, a court must determine "whether there is a

15  reasonable likelihood that the jury understood the instructions to allow conviction based on proof

16  insufficient to meet the Winship standard."  Victor, 511 U.S. at 6.  See also Ramirez v. Hatcher,

17  136 F.3d 1209, 1211 (9th Cir .1998).

18         Finally, even if it is determined that the instruction violated the petitioner's right to due

19  process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial

20  influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson,

21  507 U.S. 619, 637, 113 S. Ct. 1710 (1993), which is whether the error had substantial and

22  injurious effect or influence in determining the jury's verdict.  See Hedgpeth v. Pulido, 555 U.S.

23  57, 61–62, 129 S. Ct. 530 (2008) (per curiam).

24                B.  INSTRUCTION ON MOTIVE REQUIRING TO JURY TO DECIDE

25                     BETWEEN GUILT AND INNOCENCE (CALJIC No. 2.51)

26         Petitioner claims that the court gave an instruction[6] which improperly gave the jury the

27   _____

28   [6]  The contested instruction is CALJIC 2.51, found at RT. 1576-77; CT. 352.

12

1   task of deciding between guilt and innocence, thus shifting the burden of proof to petitioner to

2   establish his innocence, in violation of his Fifth and Fourteenth Amendment rights.

3        In this regard, the California Court of Appeal rejected this argument, relying on two state

4   court cases as follows:

5           [Petitioner] argues the trial court erred in giving a version of
            CALJIC No. 2.51 which suggested that the jurors were to find
6           defendants guilty or innocent rather than to find them guilty or not
            guilty.
7
                The trial court instructed the jury with CALJIC No. 2.51 as
8           follows:

9                Motive is not an element of the crime charged and need not
            be shown.  However, you may consider motive or lack of motive as
10          a circumstance in this case.  Presence of motive may tend to
            establish guilt.  Absence of motive may tend to establish innocence.
11          You will therefore give its presence or absence as the case may be
            the weight to which you find it entitled."
12
                [Petitioner] argues that by focusing on guilt or innocence,
13          the instruction improperly lessened the prosecution's burden of
            proof.  The identical claim was raised and rejected in *People v.
14          Estep* (1996) 42 Cal.App.4th 733, 738 and *People v. Wade* (1995)
            39 Cal.App.4th 1487, 1497.  We believe *Estep* and *Wade* properly
15          resolve the question and we adopt their analysis and conclusion.

16   ECF No. 57-9 at 16-17.

17        This court will not review the state court's rejection of petitioner's claim of jury

18   instruction error on state law grounds, because federal habeas relief is not available for alleged

19   error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1,131 S.

20   Ct. 13,16 (2010); Estelle, 502 U.S. at 67-68; Park v. California, 202 F.3d 1146, 1149 (9th Cir.

21   2000); see also Mullaney v. Wilbur, 421 U.S. 684, 691 n. 11, 95 S. Ct. 1881 (1975) (federal

22   courts will not review an interpretation by a state court of its own laws unless that interpretation is

23   clearly untenable and amounts to a subterfuge to avoid federal review of a deprivation by the state

24   of rights guaranteed by the Constitution).

25        Thus, the initial issue becomes whether federal law as announced by the Supreme Court

26   precludes use of the "old" California motive instruction as a violation of due process.[7]  Petitioner

27

28   ---
     [7]  As noted by petitioner, CALJIC 2.51 has been modified to substitute the phrase "not guilty" for
     the word "innocent."  Petitioner argues such as proof that the old instruction, at issue here,

13

1   cites no Supreme Court authority reasonably on point; nor is the undersigned aware of any related

2   to a motive instruction allegedly shifting the burden of proof because of use of the word,

3   "innocent."  Moreover, petitioner does not even cite to lower court authority in an AEDPA or

4   non-AEDPA context.  Rather, petitioner merely argues a speculation: in a clarifying instruction

5   not at all concerned with burden of proof, the jury "must have" thought that the word "innocent"

6   referenced a burden of proof for petitioner.  The much more likely scenario is the common sense

7   implication that the word "innocent," in connection with lack of motive, referenced a difficulty

8   for *the prosecution* in meeting its burden of proof directly defined by other instructions.  The

9   instruction itself gives rise to no due process problem.  At the very least, the California courts in

10  this case cannot be judged "unreasonable" in their application of generally stated Supreme Court

11  principles. [8]

12          In any event, even if the jury instruction taken alone could be thought ambiguous with

13  respect to establishing a burden of proof for petitioner, the Supreme Court has instructed that such

14  ambiguities must be assessed in light of the instructions as a whole.  Here, the court separately

15  instructed the jury on the presumption of innocence and the prosecution's burden to prove guilt

16  beyond a reasonable doubt.  CT. 335 (each essential fact must be proved beyond a reasonable

17  doubt), 361, RT. 1580 (defendant is presumed innocent and definition of reasonable doubt);  CT.

---

18  violated due process.  However, not every improvement on an old jury instruction means that
19  such instruction was constitutionally deficient.  Sometimes, it is simply the better course to
    remove any issue whatsoever so that the claim is no longer raised on appeal.
20  California Supreme Court opinions issued as recently as 2014 continue to rely on the cases and
    principles cited by the state court of appeal in this case, Wade and Estep.  See People v. Bryant,
21  60 Cal.4th 335, 438, 178 Cal.Rptr.3d 185, 288 (2014) (noting challenge based on shifting burden
    of proof has been "repeatedly and properly rejected"); People v. Watkins, 55 Cal.4th 999, 1029,
22  150 Cal.Rptr.3d 299, 327 (2013) (finding this instruction merely advises jury it *may* consider
    motive when weighing evidence, but does not shift burden from prosecution to defendant,
23  especially in light of separate burden of proof instruction that guilt must be proved beyond a
    reasonable doubt) (emphasis added).
24  [8]  Petitioner additionally contends that the government's evidence at trial supported only a lesser
    crime than first degree murder, and the jury considered it a close question since they deliberated
25  for seven and a half hours before reaching a verdict, which petitioner posits demonstrates that this
26  instructional error had a substantial and injurious effect on the verdict.  The length of a jury's
    deliberation and petitioner's assumption that it was a close question because of this challenged
27  instruction is nothing more than rank speculation.  This is not a case where the jury expressed any
28  questions related to this instruction.

396, 400, 408. 409, 420, 421, 422, RT. 1570, 1584, 1593, 1595, 1598, 1599, 1603, 1604, (several instructions included advisement that prosecution has burden of proof), 1579 (failure of defendant to deny or explain evidence does not "relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt").  In light of the numerous instructions on burden of proof and reasonable doubt, the prosecution's burden of proof was not reduced and did not shift to petitioner by the contested instruction. Furthermore, juries are presumed to follow court's instructions.  See Richardson v. Marsh, 481 U.S. 200, 211, 107 S.Ct. 1702 (1987).  There was also strong evidence of guilt.  See discussion regarding third claim *infra*.

The decision of the state appellate court rejecting petitioner's jury instruction claim in regard to CALJIC 2.51 is not contrary to or an unreasonable application of the federal due process principles set forth above.  Considering the record as a whole, the trial court's use of the word "innocence" instead of the term "not guilty" in the jury instruction regarding motive did not render petitioner's trial fundamentally unfair.  Accordingly, petitioner is not entitled to relief on this claim.

### C.  WHETHER INSTRUCTIONS IMPROPERLY REDUCED PROSECUTION'S BURDEN OF PROOF (CALJIC Nos. 2.60 AND 2.61)

Petitioner next claims that the court's use of CALJIC nos. 2.60 and 2.61 improperly reduced the prosecution's burden of proof.

The California Court of Appeal rejected petitioner's challenge to these instructions by the trial court.  That court reasoned as follows:

> [Petitioner] also takes issue with the unmodified version of CALJIC Nos. 2.60 and 2.61 given the jury.  He argues the instructions reduced the prosecution's burden of proof.

> CALJIC Nos. 2.60 and 2.61, as given to the jury, state:

> "The defendant in a criminal trial has a constitutional right not to be compelled to testify.  You must not draw any inference from the fact that the defendant does not testify.

> "Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way.  In deciding whether or not to testify, the defendant may choose to rely on the state of the

15

1    evidence and upon a failure, if any, of the People to prove beyond a
     reasonable doubt every essential element of the charge against him.
2    No lack of testimony on defendant's part will make up for the
     failure of proof by the People so as to support a finding against him
3    on any such essential element."

4         Because Luis Mendoza did not testify, [petitioner] argues
     the fact he chose to testify made these instructions irrelevant and
5    prejudicial as to him, i.e., the instructions implied that "[he] deemed
     it necessary to testify to counter the strength of the prosecution
6    evidence" and suggested to the jury that he "bore some burden of
     explanation."
7
          The claim fails.   When a defendant desires "additional,
8    amplified, exclamatory, fuller, or more complete, elaborate,
     comprehensive, definite, specific or explicit instructions," he must
9    request the same or otherwise be precluded from claiming error on
     appeal.    (People v. Reed (952) 38 Cal.2d 423, 430.)
10   Unquestionably, CALJIC Nos. 2.60 and 2.61 are correct statements
     of the law.   To the extent Mendoza deemed more explicit
11   instructions desirable to clarify their applicability to a testifying
     defendant, it was incumbent upon him to request the clarification.
12   His failure to do so precludes him from successfully raising the
     issue on appeal.  (Reed, supra, 38 Cal.2d at p. 430.)
13

14   ECF No. 57-9 at 17-18.

15        The court also gave an instruction to the jury that "[t]he word defendant applies equally to

16   each defendant unless you are instructed otherwise."  RT. 1568-69.

17        The ruling of the appellate court indicates a procedural default; however, as respondent

18   has not made this argument, the undersigned proceeds to the merits.

19        Petitioner argues that these instructions applied only to Luis, not to himself, because he

20   testified.  Therefore, he maintains, these instructions effectively told the jury that if the state has

21   not met its burden, a defendant may remain silent, and conversely if the state has met its burden,

22   the defendant should testify and/or present evidence.  Petitioner contends, "[the instructions]

23   created a rebuttable presumption that because Petitioner testified and offered witnesses, the State

24   had proved him guilty beyond a reasonable doubt."  Therefore, he argues, the prosecution's

25   burden of proof was reduced, and shifted to petitioner to rebut it.  As a result, petitioner argues,

26   the court should have instructed that testifying and presenting evidence was also a constitutional

27   right and did not create an inference that the state had proved its case.  This claim is governed by

28   AEDPA deference because in addition to defaulting petitioner or not asking for a clarification, the

16

1   appellate court held that the instructions were undoubtedly correct statements of the law.  The

2   presumption that the claim was decided on federal as well as state grounds is in play.

3       Petitioner claims that when a court chooses to instruct, it must do so properly, despite any

4   lack of request on the part of defendant.  Other than the generally cited state law cases for the

5   proposition that the court has a duty to instruct properly where it chooses to instruct, petitioner

6   cites no federal law specific to his contention that he was penalized for exercising his right to

7   testify and that the burden of proof shifted to him based on these instructions which he claims

8   created a burden of explanation on his part.

9       First, petitioner's irrelevant logic, heaping speculation upon speculation, finds no support

10  in any Supreme Court case, or the lower courts for that matter.  At least none are cited.  This is

11  not unexpected.  According to petitioner, the instruction that a defendant need not testify *might*

12  make a jury think that the testifying defendant *might* be thinking he has to testify because the

13  prosecution has already made its burden of proof without his testimony.  However, that is why

14  defendants usually testify-- as opposed to just passing the time of day on the witness stand-- they

15  do so to rebut (many times unsuccessfully) the evidence produced by the prosecution.  Everybody

16  knows that.  Petitioner's faulty concern, however, does not concern the burden of proof

17  shouldered by the prosecution.  The jury is told to assess only the evidence presented to determine

18  whether the prosecution's burden has been met.  This is so regardless of who produces, or does

19  not produce, the evidence.  A cautionary instruction about a defendant's right not to testify is

20  given solely to forbid the otherwise intuitive inference that a non-testifying defendant has

21  something to hide.  No reasonable jury would presume from such an instruction that because one

22  chooses to testify, it necessarily infects the burden of proof instructions.  Accordingly, the

23  appellate court's determination that the instructions were certainly correct was not unreasonable.

24  Even if reviewed *de novo*, the undersigned finds no due process deprivation.

25      Second, even assuming that the instructions create a negative pregnant ambiguity,

26  petitioner has not demonstrated that the instruction resulted in actual prejudice.  As before, a

27  single instruction, or these two instructions together, "may not be judged in artificial isolation, but

28  must be viewed in the context of the overall charge.  <u>Cupp v. Naughten</u>, 414 U.S. at 146-47,

1    *citing* Boyd v. United States, 271 U.S. 104, 107, 46 S.Ct. 442, 443 (1926).  As outlined in the

2    previous section, the trial court repeatedly instructed the jury on its duty to weigh the evidence

3    and determine whether the prosecution had met its burden to prove its case beyond a reasonable

4    doubt.  One such instruction was CALJIC No. 2.01 which states in part as follows:

5         [E]ach fact which is essential to complete a set of circumstances
          necessary to establish the defendant's guilt must be proved beyond a
6         reasonable doubt. In other words, before an inference essential to
          establish guilt may be found to have been proved beyond a
7         reasonable doubt, each fact or circumstance upon which such
          inference necessarily rests must be proved beyond a reasonable
8         doubt.

9    CT. 335, ECF No. 56-2 at 77.

10        Another example is CALJIC No. 2.90 which was also given:

11        A defendant in a criminal action is presumed to be innocent until
          the contrary is proved, and in case of a reasonable doubt whether
12        his guilt is satisfactorily shown, he is entitled to a verdict of not
          guilty. This presumption places upon the People the burden of
13        proving him guilty beyond a reasonable doubt. [¶] Reasonable
          doubt is defined as follows: It is not a mere possible doubt; because
14        everything relating to human affairs is open to some possible or
          imaginary doubt. It is that state of the case which, after the entire
15        comparison and consideration of all the evidence, leaves the minds
          of the jurors in that condition that they cannot say they feel an
16        abiding conviction of the truth of the charge.

17   CT. 361, ECF No. 56-2 at 103.

18        The jury is presumed to have followed these instructions.  See Richardson v. Marsh, 481

19   U.S. 200, 211, 107 S.Ct. 1702 (1987) (noting juries are presumed to follow court's instructions).

20   The fact that petitioner's brother and co-defendant did not testify, but petitioner did testify and

21   produce evidence, does not change the analysis.  Although there may have been a contrast in their

22   respective roles in the trial, the comprehensive jury instructions ensured that both defendants

23   were treated fairly and that the prosecution's burden applied to both of them.  Therefore,

24   petitioner's trial cannot be found to have been fundamentally unfair.  Petitioner has failed to

25   demonstrate how CALJIC Nos.2.60 and 2.61 minimized or negated these exacting instructions

26   given to the jury requiring that specific standards of proof be met by the prosecution in light of

27   the reasonable doubt definition.  Petitioner has also failed to show how he was prejudiced by

28   these instructions, especially in light of the evidence against him; see discussion *infra*; and habeas

1  relief may not be granted without a showing of prejudice, i.e., the ailing instruction, viewed with

2  the entirety of the instructions, has to so infect the fairness of the trial that due process is violated.

3      Accordingly, petitioner is not entitled to federal habeas relief with respect to this jury

4  instruction error claim; the instructions do not violate any clearly established federal law as

5  announced by the Supreme Court, and the appellate court was not unreasonable in so finding.

6      III.  WHETHER EVIDENCE WAS INSUFFICIENT TO PROVE PREMEDITATION,

7          DELIBERATION AND MALICE

8      Petitioner's final claim is that the evidence was insufficient to prove first degree murder

9  because he lacked the necessary intent to kill, based on evidence that he acted out of passion, fear

10  and self-defense, and not with premeditation, deliberation or malice.

11      When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is

12  available if it is found that upon the record evidence adduced at trial, viewed in the light most

13  favorable to the prosecution, no rational trier of fact could have found "the essential elements of

14  the crime" proven beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct.

15  278 (1979).  Jackson established a two-step inquiry for considering a challenge to a conviction

16  based on sufficiency of the evidence.  U.S. v. Nevils, 598 F.3d 1158, 1164 (9th Cir.2010) (en

17  banc).  First, the court considers the evidence at trial in the light most favorable to the

18  prosecution.  Id., citing Jackson, 443 U.S. at 319, 99 S. Ct. 2781.  "'[W]hen faced with a record of

19  historical facts that supports conflicting inferences,' a reviewing court 'must presume-even if it

20  does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in

21  favor of the prosecution, and must defer to that resolution.'"  Id., quoting Jackson, 443 U.S. at

22  326, 99 S. Ct. 2781.

23      "Second, after viewing the evidence in the light most favorable to the prosecution, a

24  reviewing court must determine whether this evidence, so viewed is adequate to allow 'any

25  rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'"  Id.,

26  quoting Jackson, 443 U.S. at 319, 99 S. Ct. 2781.  "At this second step, we must reverse the

27  verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact

28  ////

1   finders would have to conclude that the evidence of guilt fails to establish every element of the

2   crime beyond a reasonable doubt." Id.

3       Put another way, "a reviewing court may set aside the jury's verdict on the ground of

4   insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v.

5   Smith, ___ U.S. ___, 132 S.Ct. 2, 4 (2011).  Sufficiency of the evidence claims in federal habeas

6   proceedings must be measured with reference to substantive elements of the criminal offense as

7   defined by state law.  Jackson, 443 U.S. at 324 n.16.

8       "Jackson leaves juries broad discretion in deciding what inferences to draw from the

9   evidence presented at trial," and it requires only that they draw "'reasonable inferences from basic

10  facts to ultimate facts.'"  Coleman v. Johnson, ___ U.S. ___, 132 S.Ct. 2060, 2064 (2012) (per

11  curiam) (citation omitted).  "'Circumstantial evidence and inferences drawn from it may be

12  sufficient to sustain a conviction.'"  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir.1995) (citation

13  omitted).

14      Superimposed on these already stringent insufficiency standards is the AEDPA

15  requirement that even if a federal court were to initially find on its own that no reasonable jury

16  should have arrived at its conclusion, the federal court must also determine that the state appellate

17  court not have affirmed the verdict under the Jackson standard in the absence of an unreasonable

18  determination.  Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).  Because this claim is governed

19  by the AEDPA, this court owes a "double dose of deference" to the decision of the state court.

20  Long v. Johnson, 736 F.3d 891, 896 (9th Cir. 2013) (quoting Boyer v. Belleque, 659 F.3d 957,

21  960 (9th Cir. 2011).

22      The California Court of Appeal rejected this argument, as set forth in the following

23  portion of the opinion:

24          On appeal Luis [] argues[9] that as heat of passion was
            established "as a matter of law," his convictions should be reduced
25          to manslaughter and attempted manslaughter.  Luis [] also claims
            that if heat of passion was not established as a matter of law, the
26          evidence of such negated a finding of premeditation and
            deliberation, "requiring reduction of the murder convictions to ones

27  _____

28  [9]  Petitioner joined in the arguments raised by Luis.  ECF No. 26 at 3.

in the second degree and striking the findings of premeditation and deliberation on the attempted murders." Essentially, Luis [] argues there is no substantial evidence to support his convictions of first degree murder and attempted murder via premeditation and deliberation.

"To determine sufficiency of the evidence, one examines whether a rational trier of fact could find defendant guilty beyond a reasonable doubt. In this process one must view the evidence in the light most favorable to the judgment and presume in favor of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. To be sufficient, evidence of each of the essential elements of the crime must be substantial and one must resolve the question of sufficiency in light of the record as a whole." (*People v. Hernandez* (1988) 47 Cal.3d 315, 345-346.) When the evidence is sufficient to justify a reasonable inference the requisite intent existed, the jury's finding of that intent will not be disturbed on appeal. (*People v. Ferrell* (1980) 218 Cal.App.3d 828, 834.)

We shall not reiterate all the details of the Shell station incident and the events immediately following which culminated in the murders of Martinez and Arranda and the attempt murders of Ruiz and Carrillo. Suffice to say there is substantial evidence to support the jury's verdicts of first degree murder of Martinez and Arranda, and the attempted murder of Ruiz and Carrillo by deliberation and premeditation.

Rather than simply driving away when the Nortenos flashed their lights at [petitioner's] vehicle, [petitioner] decided to "see what they want" and pulled into the Shell station. Thus, like the Taco Bell incident some 18 months earlier, [petitioner] made a conscious decision to engage the Nortenos on their turf.

Admittedly, the Nortenos were the aggressors at the Shell station and immediately thereafter, when they pursued defendants back to the Pock Street residence. There is no question, however, that after the drive-by shooting at the Pock Street residence, defendants became the aggressors. Moreover, there is evidence from which the jurors could draw an inference that even before the Nortenos shot at the Pock Street residence, defendants had already formulated a plan to pursue and kill the Nortenos. Perez testified that even before the drive-by shooting of defendants' residence, Luis [] had entered and started the Monte Carlo and [petitioner] was inside the house. Both Rodriguez and Perez told the police that prior to the drive-by shooting, [petitioner] had already gone inside the house. From this evidence, the jury could infer the defendants had decided prior to their return to the Pock Street residence to change cars to gain the advantage of surprise and to pursue the Nortenos and wreak violence upon them. Following his arrest, [petitioner] told the police that at the time he got the shotgun from his house, he intended to kill the victims. This is substantial evidence of premeditation and deliberation.

The cold-blooded manner of the killings speaks to the elements of premeditation and deliberation.  Defendants left Pock Street in a different car to gain the advantage of surprise in finding and confronting the Nortenos.   Once defendants spotted the Nortenos' car, they followed it.  [Petitioner] directed Luis Mendoza how to maneuver the vehicle to give him a clear shot at Martinez, first telling him to move into the adjoining lane, then to pull up alongside the Nortenos' car, and then to slow down.  At that point, [petitioner] leaned outside the window and fired a single shot, striking Martinez in the head and causing him to lose control of the vehicle, which crashed immediately thereafter.

Defendants could have driven away.  Instead, they backed up to the scene of the accident.  After waiting "a little while" in the car, Luis [] directed petitioner to get out of the car.  He complied and both walked up to the Nortenos' car, where [petitioner] pointed the shotgun inside the window and fired twice at Arranda at point-blank range.  He then fired twice into the back seat, striking Ruiz in the arm and practically severing it from the shoulder.

Luis [] argues this is a classic case of manslaughter.  He notes that within minutes of being fired upon at the Shell station, pursued in a high-speed chase, and then fired upon again at his home, the defendants, along with Rodriguez and Perez got into "another car and met up with their attackers scant minutes later. [T]his is an almost textbook scenario for heat of passion."

Assuming a reasonable jury could have found defendants acted in the heat of passion in pursuing and shooting the victims, where there is substantial evidence supporting a finding of malice and premeditation, reversal is not warranted simply because this same evidence might also be reconciled with a verdict of voluntary manslaughter.  (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1213.)

[Petitioner] testified he fired at the Nortenos only in response to seeing movement by Arranda which suggested Arranda was reaching for a gun.  Carrillo testified there was no movement in the Nortenos' vehicle prior to the shot that killed Martinez. [Petitioner's] claim he fired only in response to movement by Arranda is also undermined by the fact his window was already down when he claimed to have spotted the movement, notwithstanding it was late evening in February.

[Petitioner] testified he did not aim at Martinez, but simply fired a shot at the Nortenos' vehicle.  Yet his single, "unaimed" shot was a close-range, direct hit, striking Martinez in the head.

[Petitioner] could not explain why he approached the Nortenos' crashed vehicle on foot, but testified he did not approach the car with the intent to shoot.  Yet, that is precisely what he did, and at point blank range.  The jury was not required to accept his naked assertion he lacked intent when the evidence strongly suggests the contrary.

Aside from [petitioner's] trial testimony, there were other facts which contradicted defendants' claim they were innocent victims caught in the web of gang violence. Both Mendozas lied repeatedly to the police, first denying any involvement in the shootings of the Nortenos, then denying they had discussed going after the Nortenos following the Shell station incident. Luis [] admitted subsequently there had been a discussion about pursuing the Nortenos, but only to scare them so they would not bother the Mendozas again. Luis [] then admitted he and his brother in fact discussed going after and killing the Nortenos.

Finally, defendants' claim of heat of passion and provocation was based almost entirely on the fact they deemed a quick response imperative because the Nortenos, having followed defendants back to their residence following the Shell station incident, now knew where defendants and their family lived, placing the family in jeopardy. The jury was not required to accept this claim at face value. First, there is nothing in the record which suggests that prior to the Shell station incident, the Nortenos did not know, or could not have found out, where defendants lived. Second, Edward Rodriguez's house had been the site of a drive-by shooting on the day following the Taco bell incident, i.e., some 18 months earlier, and he informed [petitioner] of the shooting. Yet, nothing suggests either Edward Rodriguez or [petitioner] deemed the fact the Nortenos knew where the former lived to be of such significance that an instant and lethal response was necessary. Third, [petitioner] testified that within two days of the Shell station incident, he was aware Carrillo and Ruiz had survived the attack. Yet, even though defendants were not arrested until almost two weeks later, they never informed their family, whose welfare they were ostensibly so concerned about, of the need to be cautious or of the possibility the family might be the victim of further drive-by shootings.

It was for the jury to determine from all of the evidence which crimes, if any, defendants were guilty of committing. The jury rejected both voluntary manslaughter and second degree murder and found first degree murder and attempted murder with premeditation and deliberation. It is not within the province of this court to reverse any judgment on the ground of insufficient evidence unless it clearly appears "that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) There is substantial evidence of a deliberate and premeditated plan to ambush the victims and then to execute them.

(ECF No. 57-9 at 10- 16.)

In this case, petitioner was convicted of first degree murder in violation of California Penal Code § 187, which states: "(a) Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." Malice is then defined as follows:

////

23

1

> Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

2

3

4

> When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought. …

5

6

7   Cal. Penal Code § 188.[10]   Implied malice exists "when a defendant is aware that he is engaging in

8   conduct that endangers the life of another."  People v. Cravens, 53 Cal.4th 500, 507 (2012).

9        Second degree murder contains the same elements as first degree murder, but without the

10   additional elements of willfulness, premeditation, and deliberation, which first degree murder

11   requires.  People v. Sandoval, ___ Cal.4th ___, 2015 WL 9449719 at *19 (Dec. 24, 2015).

12        In contrast, manslaughter is defined as "the unlawful killing of a human being without

13   malice."  Cal. Penal Code § 192.  Voluntary manslaughter is found "upon a sudden quarrel or

14   heat of passion."  Id., subd. (a).  It may also be found when the defendant kills in "'unreasonable

15   self-defense' - the unreasonable but good faith belief in having to act in self-defense [citations

16   omitted]."  People v. Lasko, 23 Cal.4th 101, 108 (2000).

17        The jury was given instructions for first degree murder, second degree murder, and

18   manslaughter.  (RT. 1586-96; ECF 56-9 at 146-56.)

19        Petitioner asserts that he acted in self-defense to protect both himself and his family and

20   friends, and in the heat of passion and based on fear, which warranted a finding of voluntary

21   manslaughter rather than first degree murder.[11]  He also contends that he shot the Nortenos just

22   four or five minutes after the Nortenos shot at his home, and that the whole event from beginning

23   to end lasted only eight minutes, supporting a finding of lack of premeditation, deliberation and

24   malice.  Petitioner's trial attorney presented these arguments to the jury and it was up to the jury

25   to determine from the evidence whether to believe his explanation or the prosecution's theory.

26

27   [10]  The same principles apply to attempted premeditated murder, of which petitioner was also convicted.

28   [11]  This discussion applies equally to the charges of attempted murder.

The claim that this was one continuous course of action that was completed in eight minutes may be true.[12]  If petitioner's evidence is to be believed, he was a non-gang member with a history of being continually harassed by these gang members, including being smashed in the face with a beer bottle among other fights, and the necessity to switch schools to avoid violence by the Nortenos.  He had been shot at previously by the Nortenos and the victim in this case on several occasions.  On the night in question, he had been chased and shot at, even at his home.  His assailants had no respect for life.  Petitioner also testified that during the ultimate shooting event, he fired in response to seeing movement by Arranda as petitioner was approaching the Nortenos' vehicle during their chase, which he thought was an effort to reach for a gun.

Yes, there was evidence from which the jury could have determined heat of passion at the time petitioner was shooting, or imperfect self-defense as a result of actions of the victims in their car.  But such possibility is not the touchstone of the sufficiency analysis.  As stated previously, the fact that several possible legal outcomes existed does not mean that the outcome chosen by the jury is insufficient.

This court may not disturb the jury's factual findings unless there is clear and convincing evidence to the contrary.  See 28 U.S.C. § 2254(e)(1).  The evidence as a whole does not support petitioner's view, and in any event is simply petitioner's take on the evidence presented.  It is true that the Nortenos were the initial aggressors; however, as recounted by the California Court of Appeal, after the Nortenos completed the drive-by shooting at petitioner's residence, petitioner made the conscious decision to pursue the Nortenos and thereafter became the aggressor.  In anticipation of their pursuit and even before the drive-by shooting, petitioner went into his house and admitted to police that he got his shotgun there and intended to kill the victims.  Petitioner could have protected his house and family from that vantage point, but nevertheless, he and his co-defendants left the house, switching cars so the Nortenos would not recognize them.  Petitioner's explanation, that the other car already had a bullet hole in it and they didn't want the

---

[12]  The trial judge's after-verdict comments to the effect that the shooting was one continuous course of conduct does not relate what the jury necessarily found.  However, even if believed, a continuous course of conduct does not *require* a finding of manslaughter—heat of passion or imperfect self-defense.

1   Nortenos to recognize them "if they happened to run into" them and try to kill them again, would

2   make sense as an innocent explanation if they had just wanted to get away from the house for a

3   while.  But the car switch was made such that they would not be recognized as *they* followed and

4   sought out the Nortenos after switching cars.  Of course, as noted by the Court of Appeal and the

5   undersigned as well, petitioner's arming himself, and switching cars to one that the Nortenos

6   would not recognize leaves little doubt that planning a shooting at the Nortenos was deliberately

7   contemplated.  Petitioner's group drove in pursuit of the Nortenos, with petitioner directing his

8   brother where to drive and maneuver the car so petitioner's open window would be next to the

9   driver's side of the Nortenos' car, presumably so he would have the best tactical advantage in

10  aiming at and shooting the driver at close range.  This colors the entire incident adverse to a

11  finding of heat of passion.  After the Nortenos' car crashed, petitioner and his co-defendants did

12  not drive away, but stayed at the scene and approached the Nortenos' car, firing into it several

13  times at close range to kill the remaining living Nortenos and finish the job.  As the appellate

14  court noted, the manner in which this aggression was carried out certainly indicates the intent to

15  kill with a premeditation and deliberation.  There were several times along the route to kill the

16  Nortenos, and at the scene of the murders, where petitioner could have changed his mind and

17  turned away, but he and his co-defendants continued the chase until the last Norteno was shot.

18       The jury was free to disbelieve petitioner's evidence; it was also free to believe the

19  objective facts presented by petitioner but reject the inferences petitioner suggested to them.  It

20  was up to the jury to determine *from all the* facts whether petitioner's mindset was heat of

21  passion, imperfect self-defense, or deliberate and premeditated.  Put another way, the jury was

22  free to conclude that neither petitioner, nor his family, were in imminent harm from the Nortenos

23  after the Nortenos left the area of petitioner's residence.  While petitioner may have been angry at

24  the time he shot at the Nortenos, such anger, justifiable as it might have seemed to petitioner, may

25  well have been judged by the jury not to rise to the level of heat of passion.  Not every killing by

26  an angry shooter is heat of passion killing.  Simply because petitioner could present a possible

27  scenario at odds with a finding of malice does not mean that the evidence in its totality was

28  insufficient.  Many trials contain conflicting evidence, but the mere presence of conflicting

1  evidence does not warrant a finding that the jury's decision to convict is based on insufficient

2  evidence.

3         Viewing the evidence in the light most favorable to the verdict, and with the

4  understanding that the appellate court conclusion of sufficiency must be AEDPA unreasonable in

5  order to grant a petition based on insufficiency, the undersigned concludes that there was

6  sufficient evidence from which a rational trier of fact could have found beyond a reasonable

7  doubt that petitioner acted with the intent to kill the victims after having deliberated about it.

8         The state courts' denial of habeas relief with respect to petitioner's insufficient evidence

9  claim is not an objectively unreasonable application of Jackson and Winship to the facts of the

10 case.  Accordingly, petitioner is not entitled to federal habeas relief with respect to this claim.

11             IV.  REQUEST FOR EVIDENTIARY HEARING

12        In his traverse, petitioner has requested an evidentiary hearing.  In Cullen v. Pinholster,

13 563 U.S. 170, 131 S. Ct. 1388 (2011), the United States Supreme Court held that federal review

14 of habeas corpus claims under § 2254(d)(1) is "limited to the record that was before the state

15 court that adjudicated the claim on the merits."[13]  131 S. Ct. at 1398.  Therefore, evidence

16 introduced at an evidentiary hearing in federal court may not be used to determine whether a state

17 court decision on the merits of a petitioner's habeas claim violates § 2254(d).  Id.  Following the

18 decision in Pinholster, the holding of an evidentiary hearing in a federal habeas proceeding is

19 futile unless the district court has first determined that the state court's adjudication of the

20 petitioner's claims was contrary to or an unreasonable application of clearly established federal

21 law, and therefore not entitled to deference under § 2254(d)(1), or that the state court

22 unreasonably determined the facts based upon the record before it, and therefore deference is not

23 warranted pursuant to § 2254(d)(2).

24        Petitioner does not articulate why an evidentiary hearing is needed, and the court can

25 discern no reason why one would be necessary.  This court has already determined that the state

26 _____

27 [13]  Even where a claim for habeas relief is simply summarily denied by the state court on the
   merits without discussion or analysis, as was the case in Pinholster, the federal habeas court is
   still ordinarily limited to consideration of the record that was before the state court. 131 S. Ct. at
28 1402 ("Section 2254(d) applies even where there has been a summary denial.").

1   court's decision was not contrary to or an unreasonable application of clearly established federal

2   law.  Nor was it an unreasonable determination of the facts.  Therefore, petitioner's request for an

3   evidentiary hearing is denied.

4   <u>CONCLUSION</u>

5          For all of the foregoing reasons, the petition should be denied.  Pursuant to Rule 11 of the

6   Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of

7   appealability when it enters a final order adverse to the applicant.  A certificate of appealability

8   may issue only "if the applicant has made a substantial showing of the denial of a constitutional

9   right."  28 U.S.C. § 2253(c)(2).  For the reasons set forth in these findings and recommendations,

10  a substantial showing of the denial of a constitutional right has not been made in this case.

11         Accordingly, IT IS ORDERED that:  Petitioner's request for an evidentiary hearing is

12  denied.

13         For the reasons stated herein, IT IS HEREBY RECOMMENDED that:

14         1.  Petitioner's application for a writ of habeas corpus be denied; and

15         2.  The District Court decline to issue a certificate of appealability.

16         These findings and recommendations are submitted to the United States District Judge

17  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

18  after being served with these findings and recommendations, any party may file written

19  objections with the court and serve a copy on all parties.  Such a document should be captioned

20  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

21  shall be served and filed within fourteen days after service of the objections.  Failure to file

22  objections within the specified time may waive the right to appeal the District Court's order.

23  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

24  Dated: February 1, 2016

25                              <u>/s/ Gregory G. Hollows</u>

26                          UNITED STATES MAGISTRATE JUDGE

27

28  mend1857.hc